William Frank **PARKER**, Petitioner,

v.

Larry **NORRIS**, Director, Arkansas Department of Correction, Respondent.

No. PB–C–91–548.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Aug. 1, 1994.

1204

Jeffrey M. Rosenzweig, Little Rock, AR, for petitioner.

Olan W. Reeves, of the Attorney General's Office, Little Rock, AR, for respondent.

*MEMORANDUM OPINION
AND ORDER*

SUSAN WEBBER WRIGHT, District Judge.

William Frank Parker, an inmate in custody of the Arkansas Department of Correction, is under sentence of death for the 1984 murders of James and Sandra Warren, the parents of his ex-wife. Parker seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on grounds that both his conviction and sentence are in violation of various provisions of the United States Constitution. Concluding that Parker was sentenced in violation of his right to due process of law, the Court grants his petition for writ of habeas corpus.

I.

Parker and his wife, Pam Warren, were divorced on June 6, 1984, following a brief and somewhat stormy marriage. An attempted reconciliation soon after the divorce proved unsuccessful. In the months that followed, Parker's relationship with Pam and her immediate family became progressively worse, and was marked by various instances of vandalism and harassment.

On November 5, 1984, Parker approached Pam's father, James Warren, and her sister, Cindy Warren, as they were getting into Mr. Warren's truck at his home in Rogers, Arkansas. Parker was brandishing a 9mm assault-type pistol and was wearing combat boots and camouflage clothing described as "army fatigue-type clothes." Cindy attempted to spray mace into Parker's face and ran down the street to a neighbor's house while Mr. Warren retreated into his house. Parker fired shots at Cindy—missing her—and then entered the house and shot to death Mr. Warren and his wife, Sandra. Parker subsequently kidnapped Pam Warren from her apartment and proceeded to the Rogers police station where he shot police officer Ray Feyan. After a standoff lasting some time, Parker was shot and wounded by police snipers. Before being apprehended, Parker shot and wounded Pam Warren.

Parker initially was convicted of capital felony murder on the theory that he had

murdered the Warrens while burglarizing their home.[1] The statute under which he had been charged required the state to prove that Parker caused the death of another "in the course of and in furtherance of the [underlying] felony." Ark.Code Ann. § 5–10–101(a)(1). As alleged by the state, the burglary was the entry of the Warrens' home for the purpose of committing the murders of the Warrens. The Arkansas Supreme Court reversed Parker's conviction because the statute under which he had been charged could not be construed to encompass the facts established at Parker's trial. *Parker v. State*, 292 Ark. 421, 731 S.W.2d 756 (1987) (*Parker I*). The court determined that "the Warrens' deaths were not caused 'in the course of and in furtherance of' a burglary" as required by Ark.Code Ann. § 5–10–101(a)(1). *Id.*

The state subsequently charged Parker under Ark.Code Ann. § 5–10–101(a)(4), which required the state to prove that Parker, with the premeditated and deliberated purpose of causing the death of any person, caused the death of two or more persons in the course of the same criminal episode. Parker, who was allowed to waive his right to counsel and represent himself at trial,[2] again was convicted of capital murder and, following the penalty phase of his bifurcated trial, sentenced to death by lethal injection. The Arkansas Supreme Court affirmed Parker's conviction and sentence on direct appeal, *see Parker v. State*, 300 Ark. 360, 779 S.W.2d 156 (1989), *cert. denied*, 498 U.S. 883, 111 S.Ct. 218, 112 L.Ed.2d 186 (1989) (*Parker II*), and denied his request to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. *See Parker v. State*, No. CR88–95, slip op., 1991 WL 19889 (Ark. Feb. 18, 1991) (unpublished *per curiam*), *cert. denied*, —— U.S. ——, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991).[3]

The petition now before the Court was filed on October 29, 1991, and sets forth numerous grounds for relief. Several months after the filing of this petition, Parker moved for partial summary judgment on the ground that his second trial violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. By order dated July 7, 1992, the Court denied Parker's motion. *See Parker v. Lockhart*, 797 F.Supp. 718 (E.D.Ark.1992). The Court concluded that because Parker's first conviction was overturned due to an error in the judicial proceedings rather than evidentiary insufficiency, the Double Jeopardy Clause did not forbid Parker's retrial in order to correct trial error. *Id.* at 725. Parker subsequently petitioned the Eighth Circuit Court of Appeals for permission to file an interlocutory appeal of this Court's order. On August 25, 1992, the Eighth Circuit issued an order denying Parker's petition.

Upon receiving the Eighth Circuit's order, the Court proceeded to set this matter for an evidentiary hearing on the remaining issues in Parker's habeas petition. Before selecting a final hearing date, however, the Court was informed that Parker wished to terminate all proceedings in his behalf and that he would refuse to cooperate with his counsel in preparation for the hearing. The Court held a hearing on this matter at which Parker expressed a desire to drop all proceedings and waive both his federal habeas rights and his right to counsel. Because the Court was concerned whether Parker was knowingly, intelligently, and voluntarily waiving his right to the assistance of counsel and his right to pursue further challenges to his sentence of death (including a complete understanding of the ramifications of waiving these rights),

---

1. Parker also was convicted of two counts of attempted first degree murder, two counts of burglary, kidnapping, and attempted capital murder, for which he is serving a life sentence plus 130 years. These convictions and sentences were affirmed on appeal and are not at issue in this petition.

2. Parker was assisted at trial by James M. Luffman and Howard L. Slinkard, both of whom served as standby counsel.

3. On March 29, 1991, Parker petitioned the United States Supreme Court for a stay of execution. Justice Blackmun granted the stay pending resolution of Parker's petition for writ of certiorari, which was filed on May 10, 1991. On October 7, 1991, the Supreme Court denied Parker's petition and dissolved the stay of execution. No new execution date has been set.

and to assure that Parker was not suffering from any mental disease, disorder, or defect (including organic brain damage) that would affect his competency to waive these rights, the Court ordered that Parker be committed to the Medical Center for Federal Prisoners in Springfield, Missouri, for a complete neuropsychological and neuropsychiatric examination. In addition, the Court ordered that Parker be examined to determine his present competency to be executed.

On August 13, 1993, the Medical Center filed its report on Parker's examination with the Court. In the report, the examining psychologist, Dr. Robert L. Denny, concluded that Parker, while possibly suffering from Cyclothymia,[4] was competent to waive his federal habeas rights and right to counsel, and was competent to be executed. However, the Court subsequently was informed that Parker had again changed his mind and that he now wished to pursue his federal habeas rights with the assistance of counsel, albeit with the condition that his counsel not call any member of his family as a witness. The Court granted counsel's request for time in which to make an attempt at locating Parker's military records (which apparently had been destroyed in a warehouse fire) and set a final evidentiary hearing on the merits of the petition for the week of May 16, 1994.

Prior to the hearing, Parker filed a pretrial brief in which he asks this Court to reconsider its decision finding that his second trial did not violate the Double Jeopardy Clause. The Court has again considered Parker's argument on this issue and remains convinced that Parker's second trial did not violate the Double Jeopardy Clause. *See Parker v. Lockhart,* 797 F.Supp. 718. The Court will now address the remaining issues presented in Parker's petition.

## II.

Parker contends his constitutional rights were violated by the trial court's denial of a psychiatrist to assist him in both the guilt and penalty phases of his trial. In support of

this argument, Parker cites *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and *Starr v. Lockhart,* 23 F.3d 1280 (8th Cir.1994). The Court has carefully considered the record on this issue and finds no error with respect to the guilt phase of Parker's trial. The Court does conclude, however, that Parker's due process rights were violated in the denial of the aid of a psychiatrist to assist him in evaluating, preparing, and presenting his mental condition as a mitigating circumstance in the penalty phase of his trial.

### A.

Parker admitted that he was responsible for the Warrens' deaths in his opening and closing statements in the guilt phase of his trial. Tr. at 1274, 1861. Having admitted to killing the Warrens, Parker's strategy was to place his mental state at issue by demonstrating that the Warrens lost their lives "as a result of a fit of rage that couldn't be controlled," Tr. at 1275, and by claiming that he was acting under some form of "duress" as a result of drugs and alcohol. Tr. at 440–443.

On January 12, 1988, Parker's counsel filed a motion requesting the appointment of a psychiatrist to assist them in developing issues relating to Parker's sanity at the time of the alleged offense. Tr. at 47–57. The state opposed the motion, arguing that the sanity of Parker at the time of the alleged crime was not likely to be a significant factor at trial. Tr. at 58–63.

On February 8, 1988, the trial court held a hearing at which it granted Parker permission to proceed *pro se* in his forthcoming trial. Tr. at 10–11 (Vol. 10). The court also addressed standby counsels' motion for the appointment of a psychiatrist. In arguing the merits of their motion, Parker's standby counsel emphasized that they believed the psychiatric condition of Parker would be a factor in the trial and that the appointment of an expert therefore was in order. Tr. at 7 (Vol. 10). Parker, who was now representing

---

4. Cyclothymia is a cyclic mood disorder, the essential feature of which is a chronic mood disturbance of at least two years' duration, involving numerous Hypomanic Episodes and numerous periods of depressed mood or loss of interest or pleasure of insufficient severity or duration to meet the criteria for a Major Depressive or a Manic Episode.

himself, objected, stating that "I have not brought up my competency, my attorneys have." Tr. at 10 (Vol. 10). Parker's standby counsel then clarified the issue, stating that they were not challenging Parker's competency, but were only contending that his psychiatric condition would be a factor in the trial. Tr. at 10–11 (Vol. 10). After considering further statements from the state, the trial court ruled as follows:

Now, as far as the additional psychiatric assistance, at this time I don't see that it's necessary because of the fact that Mr. Parker asserts no defense of insanity and unless and until I'm convinced that it's necessary I'm not going to order it but if sufficient information comes to me from either Mr. Parker or from standby counsel or from any other source to indicate that it's necessary then I'll order it. In the meantime I will assume that Mr. Parker knows what he's talking about as far as his own case is concerned and I will treat him on that basis.

Tr. at 12 (Vol. 10).

On March 7, 1988, the trial commenced with jury selection. During *voir dire* the following day, Parker stated to the court that while he thought duress is a form of mental illness, he was not raising the issue of his sanity. Tr. at 430. A short time later, Parker stated to the court that he would not have any psychiatric testimony and indicated that he was placing primary emphasis on establishing mitigating circumstances for the penalty phase:

MR. PARKER: I have never had an omnibus and I think that the depression and all that is duress and that is an affirmative defense. I don't know if I'm saying all this stuff right but I think some of the questions I want to ask this man has to do with psychiatric testimony. I have none. I understand the Prosecutor is going to have some.

THE COURT: Well, I don't understand that there's going to be any because the issue has not been raised and that's what I have been trying to tell you.

MR. PARKER: Is not duress a mitigating circumstance, under the influence?

THE COURT: Well, those, maybe those may be considered in mitigation but they're not a defense to the charge and that's what I'm saying. Therefore, they do not become issues in the case now. If and when we get down to the matter of mitigation then those things may be considered but that's not what you're asking. You keep asking his attitude about, well, what amounts to, under the law to mental disease or defect and that's just not an issue, that's what I'm trying to tell you. Now, if you want to talk about or ask him about depression and alcohol and all that within reasonable limits why I'm allowing it. I have allowed it.

Tr. at 440–41.

When the proceedings resumed, Parker engaged in the following colloquy with a prospective juror:

BY MR. PARKER:

Q. I don't know all these big fancy words these guys are using so give me a little break here. Could you accept the fact that a guy was on drugs and alcohol when he committed a crime and cut him some slack in the mitigation part of the trial?

A. Well, I ain't real sure what you just said.

Q. Do you understand what mitigation is?

A. Nope.

Q. How about aggravating?

A. That I understand.

Q. Could you explain to me what you what aggravating is to you, aggravating circumstance?

A. Well, when somebody aggravates me, I don't know, they just make me mad, whatever, they aggravate me, whatever that is, you know.

Q. Okay, okay, and mitigate you said you didn't?

A. I don't have any idea what it is.

Q. Technical stuff, I don't know either. In a Capital Murder trial the, the mitigating outweighs the aggravating. I don't believe he can ask for the death sentence, he can only say, well, if you feel that the mitigating outweighs the aggravating evidence, you can only give him life without, like [sic] without parole, but if the aggrava-

ting evidence outweighs the mitigating evidence, you can give him death, and what I'm asking you, would a mitigating circumstance to you, sir, of being under the influence of drugs and alcohol at the commission of the crime lessen the charge?

A. It depends on what evidence was presented.

Tr. at 442–43.

Following further *voir dire*, Parker's standby counsel informed the court that Parker had changed his mind and now wished for the appointment of a psychiatrist to assist him with his defense in accordance with their pre-trial motion (which, as previously noted, sought assistance for issues relating to Parker's sanity). Tr. at 471. The court, having heard Parker state that he was not raising the issue of his sanity, and having heard Parker's discussion concerning the distinction between aggravating and mitigating circumstances, denied the motion, stating that he did not see that there is an issue concerning mental disease or defect in this case as "there has been no plea of it." Tr. at 471–72.

The following day, March 9, 1988, Parker filed a handwritten motion for the appointment of a psychiatrist to assist him with "issues relating to mitigating circumstances." Tr. at 80. This motion apparently was denied, *see Parker II*, 779 S.W.2d at 159 n. 2, and Parker proceeded to trial without the assistance of an *Ake* expert at either phase of his trial.

At the conclusion of the state's case, Parker rested without calling any witnesses or putting on a formal defense.[5] Tr. at 1840. During the penalty phase, Parker, having been denied the appointment of a psychiatrist to assist him with "issues relating to mitigating circumstances," called Dr. Walter R. Oglesby, a psychiatrist with the Arkansas Department of Correction, in an attempt to establish mitigating circumstances. Tr. at

1908. This action proved fruitless as Parker received a sentence of death.

The Arkansas Supreme Court rejected Parker's claim of *Ake* error, reasoning that Parker made no effort to offer a sanity defense at the guilt phase of the trial, and suffered no prejudice in the penalty phase as he was permitted to offer considerable psychiatric testimony bearing on mitigating circumstances:

> In *Ake*, the Court held that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense. [Parker] made no such demonstration in the present case.
>
> At his first trial, [Parker] raised mental disease or defect as an affirmative defense, but he failed to do so at his second trial. On a number of occasions, [Parker], acting *pro se*, stated that he had no intention of raising a sanity defense but that he thought "duress is a form of mental illness." He later added, "Is not duress a mitigating circumstance, under the influence?" While the record reads in a somewhat disjointed fashion (largely due to the manner in which [Parker] represented himself), it is clear that [Parker] intended to raise his mental condition as a mitigating factor at the penalty phase of his trial; towards that end, he presented Dr. Oglesby, a psychiatrist with the Department of Correction, as a witness. [Footnote 2: Apparently, prior to trial, the trial court denied his request for appointment of a psychiatrist to assist him in developing issues relating to mitigating circum-

---

5. To prevail on an insanity defense, a defendant must prove by a preponderance of the evidence that at the time of the events in question, "as a result of mental disease or defect," he lacked the capacity to "conform his conduct to the requirements of law or to appreciate the criminality of his conduct." *See* Ark.Code Ann. § 5–2–312(a) and Ark.Code Ann. § 5–1–111(d). *See also Hill v. Lockhart*, 28 F.3d 832, 839 (8th Cir.1994).

Consistent with his earlier declaration that he was not raising the issue of his sanity, Parker, in resting immediately at the conclusion of the state's case, offered no evidence that would establish an insanity defense. In fact, Parker's standby counsel testified at the evidentiary hearing before this Court that Parker would not permit them to interpose a defense of insanity. D.Ct. Tr. at 18.

stances. Nevertheless, [Parker] was later given ample opportunity to contact Dr. Oglesby prior to trial and call him as a witness at trial.] Consistent with his earlier declaration that he did not intend to raise mental disease or defect as a defense during the guilt phase of his trial, he called Dr. Oglesby as a witness only at the penalty phase. From our careful examination of the record, we confirm the trial court's finding that [Parker] failed to raise the sanity defense or to show that his sanity at the time of the offense was a significant factor at trial. Because [Parker] made no effort to offer a sanity defense at the guilt phase of the trial and he was permitted to offer considerable psychiatric testimony through Dr. Oglesby bearing on mitigating circumstances, [Parker] simply fails to show prejudicial error.

*Parker II*, 779 S.W.2d at 159.

### B.

■ As a preliminary matter, the Court must determine the appropriate analysis to be used in reviewing the failure to appoint Parker an *Ake* expert. There are two separate harmless error analyses for the denial of constitutional rights. *Starr*, 23 F.3d at 1292. The first, whether the error was harmless "beyond a reasonable doubt," is known as *Chapman* analysis. *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The second, whether the error "had substantial or injurious effect or influence in determining the jury's verdict," is the analysis now normally used on habeas review. *Id.* (quoting *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)).

The court in *Starr* concluded that the appropriate analysis to be used in reviewing constitutional error will depend on the nature of the review undertaken by the state courts. The court noted that because state courts are required to apply *Chapman* analysis on direct review, it makes little sense to require federal habeas courts to engage in an identi-

cal analysis and thereby undermine the finality of state convictions which have survived direct review. 23 F.3d at 1292. The court thus concluded that *Brecht*'s reasoning is inapplicable, on habeas review, for constitutional error which the state courts have not had an opportunity to address. *Id.* (citing *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir.1993)).

In Parker's case, the Arkansas Supreme Court found no error with respect to the guilt phase, but did, apparently, find error with respect to the penalty phase. *See Parker II*, 779 S.W.2d at 159. The court concluded, however, that the error was not "prejudicial." *Id.* The question for this Court, then, is which standard of review is appropriate if the state courts had the opportunity to address the constitutional error under the *Chapman* standard but did not do so because they found there was no "prejudicial" error. The court in *Starr* concluded that considering an issue and finding no error does not carry with it an implicit *Chapman* analysis and that *Brecht* therefore does not apply. 23 F.3d at 1292. Noting that it would be unusual for certain errors to be harmless beyond a reasonable doubt, the court held that "absent an alternative holding that even if there was error, it was harmless beyond a reasonable doubt, we will apply the *Chapman* analysis." *Id.* at 1292 n. 9.

In the case at bar, the Arkansas Supreme Court's finding that Parker "simply fails to show prejudicial error" is, in effect, a finding of no error and does not carry with it an implicit *Chapman* analysis. Because there was not an alternative holding that even if there was error, it was harmless beyond a reasonable doubt, this Court will apply the *Chapman* analysis in addressing both the guilt and penalty phases of Parker's trial.[6]

### C.

■ Due process requires that an indigent defendant be provided with access to a psychiatrist to aid in evaluation, preparation, and presentation of defense or mitigating evidence when the defendant's mental condi-

---

**6.** The Court notes that its findings would be the same even applying the less stringent *Brecht* standard of review.

tion is a serious issue. *Ake*, 470 U.S. 68, 105 S.Ct. 1087; *Starr*, 23 F.3d 1280, 1287; *Little v. Armontrout*, 835 F.2d 1240 (8th Cir.1987) (en banc), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). Like both Ake and Starr, Parker's mental condition was his only viable defense and his strongest argument in mitigation for sentencing purposes. Thus, Parker's situation "falls well within *Ake*'s dictates that a capital defendant whose mental condition is seriously in issue be provided with expert assistance." *Starr*, 23 F.3d at 1288. However, the Eighth Circuit has interpreted *Ake* to require the appointment of an expert only if the defendant shows "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." *Id.* (quoting *Little*, 835 F.2d at 1244). Parker did not make that showing to the trial court with respect to the guilt phase of his trial.

As previously noted, standby counsels' January 12 motion for the appointment of a psychiatrist asserted only that Parker's sanity would be at issue.[7] Parker, however, specifically stated that he was not raising the issue of his sanity, Tr. at 430, and would not allow his standby counsel to interpose such a defense. D.Ct.Tr. at 18. Parker certainly was aware of what was involved with the defense of insanity as that was his defense in his first trial. Nevertheless, Parker never contested the trial court's numerous instructions that mental disease or defect was not at issue as Parker had not pleaded such a defense. Tr. at 266–67, 429–30, 437, 439–41, 471, 1079, 1166.

Although Parker later indicated that he had changed his mind about the desire for a psychiatrist, he asked only that a psychiatrist be appointed in accordance with his pretrial motion, *i.e.*, for assistance in developing issues related to his sanity. However, Parker never voiced concerns to standby counsel or to the court that he wanted psychiatric help for anything other than mitigation purposes, D.Ct.Tr. at 15, and standby counsel acknowledged (and the record reflects) that they did not do anything but simply ask the court for the appointment of a psychiatrist. D.Ct.Tr. at 14–15. They did not, for example, present the results of Parker's court-ordered evaluation from his first trial, nor did they argue their inability to address questions other than sanity without expert assistance. D.Ct. Tr. at 14–15. Parker simply did not make a threshold showing of the relevance and helpfulness of an expert's services with respect to the guilt phase of the trial, *see* n. 5, *supra*, and the trial court committed no error in denying standby counsels' motion for the appointment of a psychiatrist.[8]

■ Even if the failure to appoint Parker an *Ake* expert in the guilt phase was error, this error was harmless beyond a reasonable doubt. Parker was charged under a statute which required the state to prove that Parker, with the premeditated and deliberated purpose of causing the death of any person, caused the death of two or more persons in the course of the same criminal episode. *See* Ark.Code Ann. § 5–10–101(a)(4). Given Parker's decision to forego an insanity defense, there is little that an *Ake* expert could say that would have altered the overwhelming evidence establishing that Parker had the premeditated and deliberated purpose of killing at least one person and, in so doing, caused the death of two persons. *Cf. Starr*, 23 F.3d at 1292–93. Parker is not entitled to

7. The Eighth Circuit has not limited the right to expert assistance to questions of sanity. *See Starr*, 23 F.3d at 1288 n. 4 (citing *Little*, 835 F.2d at 1243).

8. Ark.Code Ann. § 5–2–305 provides that whenever a defendant charged in circuit court files notice that he intends to rely upon the defense of mental disease or defect, or there is reason to believe that mental disease or defect of the defendant will or has become an issue in the cause, the court shall suspend proceedings and direct that the defendant undergo examination. The same is true if the defendant files notice that he

will put in issue his fitness to proceed, or there is reason to doubt his fitness to proceed. In his second trial, Parker never filed a notice that he intended to rely upon the defense of mental disease or defect, nor was there reason for the trial court to believe that mental disease or defect of Parker had become an issue in the guilt phase of the trial. Likewise, there was nothing to indicate that Parker's fitness to proceed had or would become an issue. Accordingly, the trial court committed no error in failing to suspend the proceedings and order that Parker undergo an examination.

relief with respect to the guilt phase of his trial.

■ The penalty phase of Parker's trial presents a different situation, however. A criminal defendant's intellectual understanding of his actions and their gravity is clearly at issue in the penalty phase of a capital trial, *see Hill*, 28 F.3d at 835 (citing *Starr*, 23 F.3d at 1290 n. 7), and "[e]vidence of ... emotional disturbance is typically introduced by defendants in mitigation." *Id.* (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982)). Parker clearly requested the assistance of a psychiatrist to present his mental condition as a mitigating factor well in advance of the penalty phase of his trial, a fact demonstrated by the record and acknowledged by the Arkansas Supreme Court. *See Parker II*, 779 S.W.2d at 159. The trial court's failure to grant this request violated Parker's due process rights.

The entire penalty phase turned on Parker's mental condition. An examination of the evidence relevant to Parker's mental condition illustrates the probable value that *Ake* expert testimony would have had. Parker has a family history of depressive illness, with two siblings and a grandfather having committed suicide. D.Ct.Tr. at 37–38. Dr. Oglesby testified at the evidentiary hearing before this Court that such a family history is indicative of depressive illness that is of a biological nature. D.Ct.Tr. at 38. He testified that he thought Parker was acting under an extreme emotional disturbance at the time of the murders, that the murders were committed while Parker was acting under unusual pressures and influences, and that Parker's judgment was impaired. D.Ct.Tr. at 42–44. In addition, Dr. Oglesby testified at the penalty phase of Parker's trial that Par-

ker was "obviously clinically depressed," and that he was "very withdrawn" to the point of being "passively suicidal," both before and after the Warrens' deaths. Tr. 1946–47. He stated that in his opinion, Parker suffered from a depressive disorder (situational and biological), explosive disorder, and mixed substance abuse. Tr. at 1953–59.

Dr. Denny agreed with Dr. Oglesby that Parker's family history is indicative of depressive illness that is of a biological nature. D.Ct.Tr. at 74–75. He testified that Parker has a long-term personality style, which is prone to vacillating moods, irritability, and aggressiveness, and testified that Parker has a history of substance abuse which can cause these same conditions. D.Ct.Tr. at 69–70. Dr. Denny concluded that Parker's personality style and history of substance abuse could "easily" allow one to conclude that Parker suffers from Cyclothymia or possibly even Bipolar disorder.[9] D.Ct.Tr. at 70.

There can be no doubt that Parker was prejudiced in not having the benefit of an *Ake* expert in which to develop and present his mitigating evidence. The jury rejected two of the three aggravating circumstances sought by the state, finding only that Parker previously committed another felony which involved the use or threat of violence to another person.[10] Tr. at 87. Relevant mitigating circumstances that the jury could consider included, but were not limited to, that the murders were committed while Parker was under extreme mental or emotional disturbance, that the murders were committed while Parker was acting under unusual pressures or influences, and that the murders were committed while the capacity of Parker to appreciate the wrongfulness of his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication, or drug abuse. *See* Ark.Code Ann.

9. Bi-polar disorder, also known as manic depressive illness, is characterized by symptoms that include mood swings, an increased sense of energy, urgency to speak, and impulsive behavior. Many investigators consider Cyclothymia to be a milder form of Bi-polar disorder.

10. Ark.Code Ann. § 5–4–604(3) provides as an aggravating circumstance that "[t]he person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of

death or serious physical injury to another person." Also sought as aggravating circumstances, but rejected by the jury, were that "[i]n the commission of the capital murder, [Parker] knowingly created a great risk of death to a person other than the victim," *see* Ark.Code Ann. § 5–4–604(4), and that Parker "committed the capital murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody." *See* Ark.Code Ann. § 5–4–604(5).

§ 5–4–605(1), § 5–4–605(2), and § 5–4–605(3). Some, but not all, of the members of the jury found as a mitigating circumstance that "[t]he capital murder was committed while [Parker] was acting under unusual pressures or influences."[11] Tr. at 88. Given the sympathetic light in which evidence of Parker's family history and his medically significant disorders (and the prospects of successful treatment) could have been presented by an *Ake* expert, a reasonable probability exists that the jury would have unanimously found the existence of the "unusual pressures or influences" mitigating circumstance (and, possibly, the existence of other mitigating circumstances), and would have decided that the aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt. *See* Ark.Code Ann. § 5–4–603(a)(2). Even if the jury had found beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances, there is a reasonable probability that the jury would have decided that the aggravating circumstance did not justify beyond a reasonable doubt a sentence of death. *See* Ark.Code Ann. § 5–4–603(a)(3). *Cf. Hill,* 28 F.3d at 846. An *Ake* expert clearly would have assisted Parker in the development and presentation of his mitigating evidence and would have buttressed the mitigating circumstances found at Ark.Code Ann. 5–4–605(1), § 5–4–605(2), and § 5–4–605(3).[12]

■ The respondent, however, asserts that Parker was not prejudiced by the trial court's failure to appoint him professional psychiatric assistance as he was permitted to offer considerable psychiatric testimony through Dr. Oglesby. He states that he "could hardly imagine a better witness for [Parker] than Dr. Oglesby," and argues that Parker "got the very evidence he now asserts that he did not get because of a lack of funds or because the trial court refused him such service." Pre-trial Brief, at 11–12. The Court disagrees.

■ Due process requires access to an expert who will conduct, not just any, but an appropriate examination. *Starr,* 23 F.3d at 1289 (citing *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096). "Like appointed counsel, experts appointed under *Ake* are to aid the defendant and function as a 'basic tool' in his or her defense." *Id.* at 1291 (quoting *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093). To so function, they must be available to "assist in evaluation, preparation, and presentation of the defense." *Id.* (quoting *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096). Dr. Oglesby admitted that he hadn't seen Parker for several months prior to his interview with Parker just before the start of the penalty phase of the trial, Tr. at 1948, and he admitted that he never examined Parker for the purpose of assisting him in evaluating and presenting his mental condition as a mitigating circumstance. Tr. at 1939. In fact, Dr. Oglesby didn't even know the phase of the trial for which he was being called to testify. D.Ct. Tr. at 47.

While it is true that Dr. Oglesby was able to offer somewhat favorable testimony to Parker, his testimony was substantially weakened by the manner in which the prosecutor, Mr. Clinger, used to his advantage the trial court's failure to appoint Parker an *Ake* expert that had conducted an appropriate examination:

MR. CLINGER: Mr. Luffman asked Dr. Pritchard if he had ordered up some extra testing, psychological tests of this defendant. Did you have those tests performed?

DR. OGLESBY: No, I did not order these tests.

MR. CLINGER: Did you—

DR. OGLESBY: I didn't evaluate him for the purpose of coming to testify, to testify about his mental status.

---

11. Some members of the jury also found as a mitigating circumstance that Parker had "no significant history of prior criminal activity." Tr. at 88.

12. As previously noted, Dr. Oglesby, in a direct reference to these mitigating circumstances, testified at the evidentiary hearing that he thought Parker was acting under an extreme emotional disturbance at the time of the murders, that the murders were committed while Parker was acting under unusual pressures and influences, and that Parker's judgment was impaired. D.Ct.Tr. at 42–44.

MR. CLINGER: You evaluated him for the purpose of coming forward to make and state an opinion as to his mental status back when he committed the crime; is that correct?

DR. OGLESBY: When I saw him in prison, it was for the purpose of treatment.

MR. CLINGER: Then—oh, not a legal diagnosis of his mental capacity as of the date he committed these crimes?

DR. OGLESBY: We made a diagnosis for the purpose of treatment.

MR. CLINGER: And not to make a diagnosis of the, his mental condition as of the date of the commission of the crime; is that correct?

DR. OGLESBY: No, based on that information that I gathered after I had seen him.

MR. CLINGER: All right. I'll try one more time, Doctor. Am I correct that your purpose in evaluating him was not to form a legal opinion as to his mental status as of the date he committed the crime?

DR. OGLESBY: Well, that's correct. The last time I saw him I was not seeing him for that purpose.

MR. CLINGER: Thank you.

Tr. at 2090–91.

During his closing argument in the penalty phase, Mr. Clinger highlighted the inadequacy of Dr. Oglesby's examination of Parker, and specifically pointed out that Dr. Oglesby was not an expert designated by the court to determine Parker's mental status:

[F]irst of all who's Doctor Oglesby, who is he? I got no quarrel with Doctor Oglesby or his credentials. I may have a quarrel with spending an hour and a half or two hours of time talking about a PET Scan he didn't · even use in his treatment of or evaluation of the Defendant,[13] but be that as it may, I have got nothing personally against him, but you do have to look at his role in this and what his true function is. He's not a mental health expert that's designated by the Court to determine what this man's mental status was back when he killed the Warrens, he's not the person who evaluated [Parker] to determine, [Parker], did you know what you were doing when you killed these people, were you psychotic.

Tr. at 2121.

This argument effectively highlighted the inadequacy of Dr. Oglesby's examination and exacerbated the resultant harm to Parker. *Cf. Starr*, 23 F.3d at 1293. Dr. Oglesby's testimony regarding Parker's mental disorders (which was not contradicted by Dr. Denny) would have carried substantially much more weight had it been presented by an *Ake* expert who had conducted an appropriate examination. Instead, Dr. Oglesby's credibility as a witness was effectively undermined for his not having been "designated" by the court to determine Parker's mental status, and for having failed to conduct appropriate examinations. Parker was defenseless to the prosecution's attack on the credibility of Dr. Oglesby, a situation that would not have occurred had the trial court appointed him an *Ake* expert. The Court rejects the respondent's claim that Parker suffered no prejudice.[14]

---

**13.** As described by Dr. Oglesby, a PET (Positron Emission Tomography) scan identifies various neurological conditions such as depressive disorders that have physiological origins. Tr. at 1915–17. Mr. Clinger belittled Dr. Oglesby for testifying about a technique that was not employed on Parker: "Doctor Oglesby, are you telling us you talked for an hour, hour to an hour and a half this morning about a technique that has not even been applied to this Defendant?" Tr. at 1981–82.

**14.** The respondent also refers to a January 1985 evaluation Parker received at the Arkansas State Hospital prior to his first trial. However, the examining psychologist for that evaluation, Dr. David Pritchard (who was called to rebut Dr.

Oglesby's testimony), testified that Parker was only evaluated to determine his competency to stand trial and to determine the legal question of whether he could appreciate the criminality of his conduct or whether he could conform his conduct to the requirements of the law. Tr. at 2037. Dr. Pritchard's evaluation was wholly inadequate to assist Parker in evaluating, preparing, and presenting his mental condition as a mitigating circumstance at either of his two trials. *Cf. Starr*, 23 F.3d at 1289–90. The inadequacy of this evaluation was illustrated by Dr. Pritchard's refusal to express an opinion regarding mitigating circumstances: "I don't think that's—I don't think I have an opinion on that. I think that is a legal phrase, extreme emotional disturbance is a legal phrase. If you want to say

In sum, the Court finds that Parker has shown a reasonable probability that a psychiatrist would have aided him in evaluating, preparing, and presenting his mental condition as a mitigating circumstance in the penalty phase of his trial, and that the failure to appoint him a psychiatrist rendered his sentencing fundamentally unfair. Because Parker's mental condition was the only issue in the penalty phase of his trial, the Court cannot find this error to be harmless beyond a reasonable doubt.

### III.

Parker next challenges the one aggravating circumstance found to be present in his case. As previously noted, the jury rejected two of the aggravating circumstances sought by the state, but did find that Parker previously committed another felony which involved the use or threat of violence to another person. Tr. at 87. In arguing for the existence of this aggravating circumstance, the state alleged that Parker had previously committed the offenses of aggravated assault[15] and terroristic threatening.[16] Tr. at 87, 2098, 2181. Parker contends his rights were violated by the use of the "prior violent felony" aggravating circumstance in the following respects: (1) the Arkansas Supreme Court improperly reviewed the evidence with respect to this aggravating circumstance; (2) he was denied instructions on lesser included offenses of aggravated assault and terroristic threatening; (3) his rights were violated by the use of uncharged misconduct as the sole basis for a death penalty, by the denial of an opportunity for vindication on the aggravated assault and terroristic threatening offenses, and by using prior uncharged crimes in which the statute of limitations had expired; and (4) use of the allegations concerning the aggravated assault and terroristic threatening offenses violated the Double Jeopardy Clause. Each of these claims will be addressed in turn.

#### 1.

Parker first argues that the Arkansas Supreme Court improperly reviewed the evidence with respect to the "prior violent felony" aggravating circumstance. Citing *Rust v. Hopkins*, 984 F.2d 1486 (8th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), Parker argues that the Arkansas Supreme Court's holding that "the same degree of proof is not required to sustain a jury finding that an aggravating circumstance exists, as would be required to sustain a conviction," *see Parker II*, 779 S.W.2d at 160, violated his rights to due process and deprived him of rights secured to him by the Eighth Amendment.

In determining whether a state court's application of its constitutionally adequate aggravating circumstance[17] was so erroneous as to raise an independent due process or Eighth Amendment violation, the appropriate standard of review is the "rational factfinder" standard established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Lewis v. Jeffers*, 497 U.S. 764, 781, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990). The Supreme Court has explained that the *Jackson* standard applies

---

that that person who is angry is extremely emotionally disturbed, therefore that's going to affect his punishment, then fine, but don't ask me about it." Tr. at 2068. The Court notes that at the time of Parker's trial, the statute pursuant to which he was evaluated, Ark.Code Ann. § 5–2–305, required a psychiatric examination, which was not given. Tr. at 2062. *See also Parker II*, 779 S.W.2d at 159 n. 1. The statute was subsequently amended to permit examination in some instances by a forensic psychologist.

**15.** A person commits aggravated assault if, "under circumstances manifesting extreme indifference to the value of human life, he purposefully engages in conduct that creates a substantial danger of death or serious physical injury to another person." Ark.Code Ann. § 5–13–204(a).

The jury was instructed on this definition of aggravated assault in the penalty phase of the trial. Tr. at 87, 2098.

**16.** A person commits terroristic threatening if, "[w]ith the purpose of terrorizing another person, he threatens to cause death or serious physical injury or substantial property damage to another person." Ark.Code Ann. § 5–13–301(a)(1)(A). The jury was instructed on this definition of terroristic threatening in the penalty phase of the trial. Tr. at 87, 2098.

**17.** This Court has previously found the aggravating circumstance at issue in this case to be constitutional. *See Whitmore v. Lockhart*, 834 F.Supp. 1105, 1122 (E.D.Ark.1992), *aff'd*, 8 F.3d 614 (8th Cir.1993).

even when reviewing the decisions of a state appellate court:

> [A] federal court should adhere to the *Jackson* standard even when reviewing the decision of a state appellate court that has independently reviewed the evidence, for the underlying question remains the same: If a State's aggravating circumstances adequately perform their constitutional function, then a state court's application of those circumstances raises, apart from due process and Eighth Amendment concerns, only a question of the proper application of state law. A state court's finding of an aggravating circumstance in a particular case ... is arbitrary or capricious if and only if no reasonable sentencer could have so concluded.

*Jeffers,* 497 U.S. at 783, 110 S.Ct. at 3103.

■ The Court has carefully examined the record and has no hesitation in concluding that a rational trier of fact could have found beyond a reasonable doubt the existence of the "prior violent felony" aggravating circumstance. With respect to the allegations concerning the aggravated assault, Pam Warren testified that on the evening of April 27, 1984, Parker, who was in a "rage" over events that had transpired that night, picked up a steak knife that was lying on a kitchen table and "just reared back his hand and threw the knife overhanded as hard as he could." Tr. at 1886–87. She testified that the knife hit a piece of tile about six inches from her face (breaking the tile in half), and that this incident occurred immediately after she had threatened to call the police if Parker did not "settle down." Tr. at 1887. The Court agrees with the Arkansas Supreme Court that "[c]learly, the knife throwing incident created a substantial danger of death or serious injury." *Parker II,* 779 S.W.2d at

160. The evidence was sufficient to support a finding of aggravated assault.

■ With respect to the allegations concerning the terroristic threatening offense, Ms. Warren testified that later that same evening, Parker stood in a doorway pointing a shotgun at her for four or five minutes not saying anything but simply laughing. Tr. at 1887. Although Ms. Warren had earlier testified that Parker's gun may have been inoperable as the firing pin had been removed, Tr. at 1346, she also testified that the gun "work[ed]," Tr. at 1347, and that she was "terrified" by this incident. Tr. at 1888. Given this evidence, a rational trier of fact could have found beyond a reasonable doubt that Parker threatened to cause death or serious physical injury to Ms. Warren with the purpose of terrorizing her.[18]

Nevertheless, Parker cites *Rust v. Hopkins,* 984 F.2d 1486, and argues that the Arkansas Supreme Court's review of the evidence relevant to the existence of the "prior violent felony" aggravating circumstance violated his due process and Eighth Amendment rights. The Court finds Parker's reliance on *Rust* to be misplaced. In that case, John Rust was convicted of murder in the shooting death of a civilian who had chased and shot at Rust after Rust had participated in an armed robbery. Pursuant to Nebraska law, a sentencing panel of three state district judges was convened to determine whether the death penalty was warranted. The Panel found the existence of four aggravating circumstances and one mitigating circumstance. The Panel weighed the aggravating and mitigating circumstances and concluded that a sentence of death was warranted. On direct appeal, the Nebraska Supreme Court affirmed Rust's conviction and sentence. Relying on a decision handed down the same day

18. Parker states that "[t]he obvious issue, one presented to the state supreme court, is whether pointing a gun known to be unfirable can be 'for the purpose of terrorizing another person.'" Pre-trial Brief, at 38. The Court notes, however, that it is not entirely certain which gun Parker pointed at Ms. Warren. When asked how many guns Parker had in the house, Ms. Warren answered, "[t]here was the shotgun then, he had a sawed-off shotgun, the pin had been removed." Tr. at 1346. When asked which gun Parker pointed at her, she answered, "[i]t was the shot-

gun, rifle type gun." Tr. at 1346. It was the "rifle type gun" to which Ms. Warren referred when stating that the gun worked. She noted that Parker had been hunting with that gun and that she didn't know whether the gun was loaded. Tr. at 1347. Ms. Warren's description of the "rifle type gun" seemingly refers to a gun other than the sawed-off shotgun. In any event, it was for the jury to resolve any conflicts in the testimony, and this Court finds that the evidence was sufficient to support a finding of terroristic threatening.

it decided Rust's appeal and which for the first time held that aggravating circumstances must be proven beyond a reasonable doubt, the Nebraska Supreme Court concluded that its review of the evidence indicated that each circumstance in Rust's case had been proven beyond a reasonable doubt.

The Eighth Circuit Court of Appeals concluded, as did the district court, that Rust's sentence was imposed in violation of his rights to due process and, therefore, was invalid. *Rust*, 984 F.2d 1486, 1493. The court found that the violation of Rust's due process rights was two-fold:

> First, Rust was not sentenced by a panel applying the beyond a reasonable doubt standard for aggravating circumstances. * * * The proper standard was not applied until the Nebraska Supreme Court reviewed Rust's sentence. However, the Supreme Court has recognized that "when state law creates for a defendant a liberty interest in having a jury make particular findings, speculative appellate findings will not suffice to protect that entitlement for due process purposes." *Clemons v. Mississippi*, 494 U.S. 738 at 746, 110 S.Ct. 1441 at 1447, 108 L.Ed.2d 725 (1990). Here, Nebraska created a liberty interest in having a panel of judges make particular findings, specifically, the proper weight to be given aggravating circumstances based on facts proven beyond a reasonable doubt. Rust was deprived of this interest, a deprivation so serious that it cannot be cured by appellate review. The sentencing panel's use of an improper standard contaminated all its findings regarding aggravating circumstances. Rust simply never had the opportunity to be sentenced by a panel as contemplated in the Nebraska statutes.

> \* \* \* \* \* \*

> The second facet of the constitutional violation here is the deprivation of any meaningful appellate review. Even if we assume that the Nebraska Supreme Court could have remedied the invalidity in the sentencing panel's determination by stepping in and "resentencing" Rust under the proper standard, the actions of the Nebraska Supreme Court would still violate due process. The whole point of the two-

tier sentencing procedure is that the initial determination is reviewed by an independent appellate court. The two-tier process would be subverted if the Nebraska Supreme Court could step in and fully perform the work of the sentencing panel. Yet that is precisely what occurred in this case. The Nebraska Supreme Court did not merely "review" the determinations of the sentencing panel, it effectively resentenced Rust under a standard it had created that very same day. The existence of independent (and often automatic) appellate review has been a crucial factor in the Supreme Court's upholding the constitutionality of state capital punishment schemes. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976); *Proffitt*, 428 U.S. at 253, 96 S.Ct. at 2967; *Godfrey v. Georgia*, 446 U.S. 420 at 429, 100 S.Ct. 1759 at 1765, 64 L.Ed.2d 398 (1980). Thus, the deprivation of meaningful appellate review is an independent violation of Rust's constitutional rights.

*Rust*, 984 F.2d at 1493–94.

The facts in *Rust* are markedly different from those in the case at bar and provide Parker no basis for attacking the Arkansas Supreme Court's review of the "prior violent felony" aggravating circumstance. The jury in Parker's trial was specifically instructed by the trial court that it must unanimously find the existence of aggravating circumstances beyond a reasonable doubt, Tr. at 2095, and the checklist on the jury verdict forms likewise instructed the jury that it must unanimously find the existence of aggravating circumstances beyond a reasonable doubt. Tr. at 85–87, 90. Unlike the sentencing panel in *Rust*, the jury in Parker's trial engaged in the proper inquiry in the first instance, and the Arkansas Supreme Court, after reviewing the jury's determination and the evidence supporting it, properly concluded that the evidence was sufficient to support the jury's conclusion that the "prior violent felony" aggravating circumstance existed beyond a reasonable doubt. *Parker II*, 779 S.W.2d at 160.

Although the Arkansas Supreme Court held that the same degree of proof is not

required to sustain a jury finding that an aggravating circumstance exists, the Court did not apply a *lower* burden of proof in sustaining the jury's finding. *See Parker II*, 779 S.W.2d at 160. The court cited to its earlier decision in *Miller v. State*, 269 Ark. 341, 605 S.W.2d 430 (1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981), in which it stated that it does "not consider the jury's findings [regarding aggravating circumstances] as separate little verdicts, and we do not require the same degree of proof to sustain a jury finding that an aggravating or mitigating circumstance exists as we would require to sustain a conviction if that circumstance was a separate crime." *Id.*, 605 S.W.2d at 439. The court in *Miller* noted that one of the reasons the statutes regarding aggravating and mitigating circumstances were enacted "was to give this court an insight to the thought processes of the jury so that we can compare the circumstances of cases involving the death sentence in our effort to avoid any arbitrary and unconstitutional application of the sentence." *Id.*[19]

Parker simply misreads *Parker II* in arguing that the Arkansas Supreme Court improperly reviewed the evidence with respect to the "prior violent felony" aggravating circumstance. Parker was neither sentenced on an improper standard of proof nor deprived of an opportunity for meaningful appellate review.

2.

■ Parker next argues that his rights were violated by the denial of instructions on lesser included offenses of the "prior violent felony" aggravating circumstance. As previously noted, the state alleged that Parker previously committed the offenses of aggravated assault and terroristic threatening, both of which are class D felonies. *See* Ark. Code Ann. §§ 5–13–204(a) and 5–13–301(a)(1)(A). Citing *Beck. v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Westbrook v. State*, 265 Ark. 736, 580 S.W.2d 702 (1979), Parker contends that had the trial court given instructions on lesser included offenses for these felonies, the

jury might have found Parker's alleged acts to have been mere misdemeanors and, thus, not applicable to the "prior violent felony" aggravating circumstance. This claim is without merit.

In *Beck*, the Supreme Court held that the death penalty may not constitutionally be imposed after a jury verdict of guilt of a capital offense where the jury was not permitted to consider a verdict of guilt of a lesser included offense. 447 U.S. at 627, 100 S.Ct. at 2385. Among the concerns expressed in *Beck* was the pressure a jury might feel in returning a verdict of guilt when faced with the "all-or-nothing" option of guilt or acquittal.

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

447 U.S. at 637, 100 S.Ct. at 2389. Similarly, the Arkansas Supreme Court in *Westbrook* noted the "[p]assion and prejudice" attendant to the crime in that case and its concern that the case "went to the jury with only one possible conviction—capital murder." 580 S.W.2d at 707.

The concerns expressed in *Beck* and *Westbrook* revolved around questions arising out of the *guilt* phases of the respective trials and simply do not apply to Arkansas' sentencing scheme. "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment." *Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 1755, 90 L.Ed.2d 123 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438, 101 S.Ct. 1852, 1858, 68 L.Ed.2d 270 (1981)). *Accord Miller v. State*, 605 S.W.2d

---

19. As in the case at bar, the form listing the aggravating circumstances in *Miller* required the jury to find the existence of aggravating circumstances beyond a reasonable doubt. *Id.* at 438.

430, 439. There was no need to instruct the jury on the lesser included offenses of aggravated assault and terroristic threatening since the jury was required to find that the "[a]ggravating circumstances justify a sentence of death beyond a reasonable doubt" before it may impose the death penalty. *See* Ark.Code Ann. § 5–4–603(a)(3). Under Arkansas' sentencing scheme, even if the jury finds the existence of aggravating circumstances and determines that those aggravating circumstances outweigh beyond a reasonable doubt the existence of any mitigating circumstances, the jury may still determine that the defendant's previous felonies were such that they did not warrant the death penalty and reject the penalty of death. *See Whitmore,* 834 F.Supp. at 1122. Section 5–4–603(a)(3) performs in the penalty phase of a capital murder trial the same essential function that instructions on lesser included offenses perform in the guilt phase and, thus, satisfies the concerns expressed in *Beck* and *Westbrook.*

Even were Parker being tried on charges of aggravated assault and terroristic threatening, he was not entitled to instructions on lesser included offenses. In order for the jury to be instructed on lesser included offenses, Parker had to produce evidence sufficient for the jury to find him guilty of the lesser offense and acquit him of the greater. *See Hooper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982). While Parker did attempt to impeach Pam Warren's testimony regarding these alleged events, Tr. at 1889–91, he presented no evidence in which the jury could convict him of the lesser offenses of aggravated assault and terroristic threatening and acquit him of the greater. Parker is not entitled to relief on this issue.

3.

Parker next argues that it is unconstitutional to use uncharged misconduct as the sole basis for a death penalty. He additionally argues his rights were violated by the denial of an opportunity for vindication on the aggravated assault and terroristic threatening offenses by never charging him and then using the allegations against him in the penalty phase of the trial, and by using prior uncharged offenses in which the statute of limitations had expired. These claims are without merit.

Under Arkansas law, prior unadjudicated crimes may be used as aggravating circumstances to support a death sentence. *Hill v. Lockhart,* 791 F.Supp. 1388, 1392 (E.D.Ark.1992) (citing *Miller v. State,* 280 Ark. 551, 660 S.W.2d 163 (1983), and *Gardner v. State,* 296 Ark. 41, 754 S.W.2d 518 (1988)). Such evidence does not infringe upon a defendant's federal constitutional rights. *Id.* (citing *Gilmore v. Armontrout,* 861 F.2d 1061, 1073 (8th Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989)). "The Supreme Court has held that a wide scope of evidence and argument is admissible during the penalty phase of a capital murder trial, provided that such evidence is not 'constitutionally impermissible or totally irrelevant to the sentencing process.'" *Gilmore,* 861 F.2d at 1073 (quoting *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983)). This broad use of evidence has been sanctioned because it helps prevent arbitrary and capricious imposition of the death penalty by focusing the jury upon each individual murder, and because it is desirable that the jury have as much information as possible in making its sentencing decision. *Id.* (citing *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976), and *Gregg v. Georgia,* 428 U.S. 153, 204, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976)).

Although Parker claims he was not allowed an opportunity to vindicate himself on these offenses, the record shows that Parker's standby counsel did cross-examine Pam Warren in an effort to impeach her testimony regarding these alleged events. Tr. at 1889–91. Counsel pointed out that Ms. Warren, "for all [her] terror and fright," didn't say a word to the police (who arrived on the scene almost immediately after the events) that she had been threatened, either by the knife or the shotgun. Tr. at 1889–90. In this respect, Ms. Warren acknowledged in response to questioning from standby counsel that Parker simply "handled it." Tr. at 1890. Counsel for Parker clearly was attempting to raise doubts in the jury's mind about wheth-

er the incidents actually occurred, and the Court finds that Parker was afforded a full opportunity in which to vindicate himself on the aggravated assault and terroristic threatening offenses, thereby precluding their application to the "prior violent felony" aggravating circumstance.

Parker also argues that his rights were violated by the use of prior uncharged crimes in which the statute of limitations had expired. While it is true that the "prior violent felony" aggravating circumstance does not place any time restrictions on which violent crimes may be considered, *see Hill v. State,* 289 Ark. 387, 713 S.W.2d 233, 237 (1986) (this section applies to crimes not connected in time or place to the killing for which the defendant has just been convicted), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 182 (1987), the jury must still find pursuant to Ark.Code Ann. § 5–4–603(a)(3) that the "[a]ggravating circumstances justify a sentence of death beyond a reasonable doubt." Thus, as was noted in the previous issue concerning instructions on lesser included offenses, in the event the jury finds that the defendant committed a violent crime many years ago and which would otherwise be barred by the statute of limitations, it may take into account that the previous crime was an isolated incident or otherwise insignificant and reject the penalty of death on that basis. *See Whitmore,* 834 F.Supp. at 1122. The use of such crimes to establish the "prior violent felony" aggravating circumstance did not violate Parker's constitutional rights in any manner. *See Whitmore v. Lockhart,* 8 F.3d 614, 624–25 (8th Cir. 1993); *Hill v. Lockhart,* 927 F.2d 340, 344 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 344, 116 L.Ed.2d 283 (1991).

4.

Finally, Parker claims that the "prior violent felony" aggravating circumstance failed as a matter of proof in *Parker I,* and that the state's use in *Parker II* of different evidence to establish this aggravating circumstance (*i.e.,* the allegations concerning the aggravated assault and terroristic threatening offenses) violated the Double Jeopardy Clause. This claim is without merit.

When a defendant obtains reversal of his conviction on appeal "the original conviction has been nullified and 'the slate wiped clean.'" *Poland,* 476 U.S. at 152, 106 S.Ct. at 1753 (quoting *Bullington,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270). Thus, if the defendant is convicted again, he constitutionally may be subjected to whatever punishment is lawful. *Id.*

> We reject the fundamental premise of petitioner's argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes. *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate.*

*Id.,* 476 U.S. at 155, 106 S.Ct. at 1755 (emphasis in original).

At no point during Parker's first capital sentencing and subsequent appeal did either the sentencing jury or the reviewing court hold that the prosecution had failed to prove its case that Parker deserved the death penalty. The jury in Parker's first trial clearly did not so hold for it sentenced Parker to death. While the Arkansas Supreme Court reversed Parker's conviction, it did so because, among other things, the trial court erred regarding the applicability of this aggravating circumstance to Parker's case. *See Parker I,* 731 S.W.2d 756. The Court did not conclude that the state lacked sufficient evidence to support the aggravating circumstance or that the state had failed to prove the appropriateness of the death penalty. *Id.* There simply was no "acquittal" of the "prior violent felony" aggravating circumstance, either at trial or on appeal, and the Double Jeopardy Clause therefore did not foreclose a second sentencing hearing at which the "clean slate" rule applied. *Poland,* 476 U.S. at 157, 106 S.Ct. at 1756.

IV.

Parker next challenges what he characterizes as contradictory findings of the jury in the penalty phase of the trial. All members of the jury found as an aggravating

circumstance that Parker previously committed a felony which involved the use or threat of violence to another person. Tr. at 87. Some, but not all, of the members of the jury found as a mitigating circumstance that Parker had "no significant history of prior criminal activity."[20] Tr. at 88. The jury then unanimously agreed that the aggravating circumstance outweighed beyond a reasonable doubt any mitigating circumstances and that the death penalty was justified beyond a reasonable doubt. Tr. at 90–91. Parker contends the findings of the jury were contradictory and violate the Eighth Amendment's requirement of reliability in sentencing. The Court disagrees.

There is nothing contradictory or illogical in the jury's findings. Although Parker presumes that the jury's understanding of the phrase "no significant history of criminal activity" requires no prior criminal offenses, this phrase must be interpreted as the jury *could have* understood it. *Simmons v. Lockhart*, 814 F.2d 504, 513–14 (8th Cir.1987), *cert. denied*, 485 U.S. 1015, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988). In this regard, the Court agrees with the Arkansas Supreme Court that "the jury could have unanimously found [Parker] committed prior violent felonies used by the state in showing an aggravating circumstance, but at the same time, some jurors may not have considered those prior felonies a significant history of prior criminal activity." *Parker II*, 779 S.W.2d at 160. Such an interpretation of the jury's findings is reasonable and does not render Parker's sentence unreliable. "This Court will not second-guess the verdict of a jury, rational on its face, on such a slender showing as has been offered here." *Simmons*, 814 F.2d at 514.

 Parker also argues that the jury verdict forms used in his case imply that unanimity is required with respect to mitigating circumstances, thus violating the principles established in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). In *Mills,* the Supreme Court reversed a death

sentence imposed under Maryland's capital punishment scheme because the jury instructions and verdict form created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." 486 U.S. at 384, 108 S.Ct. at 1870. The Court concluded that allowing a "holdout" juror to prevent the other jurors from considering mitigating evidence violated the principle established in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that a sentencer may not be precluded from giving effect to all mitigating evidence. *Id.*, 486 U.S. at 375, 108 S.Ct. at 1865. Similarly, in *McKoy*, the Supreme Court held that an instruction which allowed a jury to consider only mitigating circumstances that it unanimously found to exist was unconstitutional. 494 U.S. 433, 110 S.Ct. 1227. The Court concluded that the unanimity requirement prevented the sentencer from considering all mitigating evidence and violated it's decision in *Mills*. *Id.* at 435, 110 S.Ct. at 1229.

The applicability of *Mills* and *McKoy* to the Arkansas death penalty scheme has previously been rejected, *see Pickens v. Lockhart*, 802 F.Supp. 208, 215 (E.D.Ark.1992), *aff'd*, 4 F.3d 1446, 1453 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1206, 127 L.Ed.2d 553 (1994), and the facts in Parker's case compel the same conclusion. Jury verdict Form 2 allows the jury to list mitigating circumstances found by some, but not all, of the members of the jury, and whether there was *any* evidence of mitigating circumstances. Tr. at 88–89. Jury verdict Form 3 allows the jury to determine if the aggravating circumstances outweigh beyond a reasonable doubt *any* mitigating circumstances. Tr. at 90. The jury was properly instructed on the procedure it must follow in completing these forms, Tr. at 2094–2101, and nothing in the instructions or the forms prevents the consideration of constitutionally relevant evidence or indicates to the jury that a mitigating circumstance must be found unanimously before it may be considered in determining

---

20. As previously noted, some members of the jury also found that "[t]he capital murder was committed while [Parker] was acting under unusual pressures or influences." Tr. at 88.

whether to impose the penalty of death. *See Pickens v. State,* 301 Ark. 244, 783 S.W.2d 341, 345 (1990), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 766 (1990). Parker is not entitled to relief on this issue.

## V.

■ Parker next contends his due process rights and right to a fair trial were violated in being allowed to stand trial and represent himself. He claims he was incompetent to stand trial and represent himself, and that the people who knew him best—his court-appointed lawyers—considered him to be incompetent. The Court has carefully considered the record on this issue and finds Parker is not entitled to relief.

■ The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran,* —— U.S. ——, ——, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) *(per curiam)).* The competency standard for waiving the right to counsel is the same as the competency standard for standing trial. *Id.,* —— U.S. at ——, 113 S.Ct. at 2685. *See also Farreta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (a defendant choosing self-representation must do so knowingly and intelligently).

On December 4, 1987, Parker filed a motion to proceed *pro se* in his forthcoming trial. Tr. at 46. Parker cited *Farreta* in his motion and specifically stated that he was suffering no mental disease or defect which would render him unable to understand the proceedings against him. *Id.* The trial court held a hearing on Parker's motion at which Parker was warned about the consequences of proceeding *pro se.* Tr. at 1–4 (Vol. 10). Parker stated that he understood the possible penalties if he was found guilty, that he would lose his right of self-represen-

tation under *Farreta* if he misbehaved, and that he would be required to comply with the relevant rules of procedure. Tr. at 3 (Vol. 10). Parker further stated that he understood his defense, including trial tactics, would be under his control, and Parker himself cited Rule 37 of the Arkansas Rules of Criminal Procedure in acknowledging that he could not later complain about the quality of his defense and raise an ineffective assistance of counsel claim. Tr. at 3–4 (Vol. 10). Parker's standby counsel acknowledged they were not raising the issue of Parker's competency, and the trial court subsequently ruled that Parker would be entitled to represent himself as long as he followed the rules.[21] Tr. at 10–11 (Vol. 10).

There simply is nothing in the record to indicate that Parker's decision to proceed *pro se* was not knowingly, intelligently, and competently made, or that he was not competent to stand trial. The trial court thoroughly explained to Parker the consequences of proceeding *pro se* and what would be expected of him at trial, and Parker was aware of the requirements of *Farreta,* having cited the decision in his motion to proceed *pro se. Cf. United States v. Stewart,* 20 F.3d 911, 913–14 (8th Cir.1994). It certainly cannot be said that Parker was unaware of what was involved in a capital murder trial as Parker previously had contact with the criminal justice system in his first trial sufficient to give him a general knowledge of the disadvantages of self-representation. *See Meyer v. Sargent,* 854 F.2d 1110, 1114–15 (8th Cir. 1988). In addition, Parker's standby counsel testified at the evidentiary hearing before this Court that Parker was competent and able to assist them at the time of trial. D.Ct. Tr. at 9, 25–26. Mr. Luffman stated that they wanted psychiatric assistance, not because of doubts concerning Parker's competency, but because of the nature of the case, D.Ct.Tr. at 14, and Mr. Slinkard noted that Parker was aware of the proceedings and circumstances involved. D.Ct.Tr. at 26. Indeed, Parker's conduct at trial and the pleadings he prepared show an individual who did not exhibit any bizarre behavior, who was able to carry on a normal conversation, who

---

21. The court did, however, require that Mr. Slinkard and Mr. Luffman remain as standby counsel

in case there came a time in which Parker felt he needed their assistance. Tr. at 11 (Vol. 10).

was well-informed about the legal process, and who was knowledgeable about the materials he felt he would need to defend himself.[22]

It is of no import that Parker's representation of himself may have been lacking in the skills normally possessed of an experienced criminal defense lawyer. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." *Godinez*, —— U.S. at ——, 113 S.Ct. at 2687. Thus, while " '[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,' a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." *Id.* (Emphasis in original.) Parker is not entitled to relief on this issue.

### VI.

■■■ Parker next claims the use of a transparent plexiglass screen around the witness stand deprived him of his right to a fair trial.[23] Although it is not apparent from the record, the screen appears to have been put in place because Parker was representing himself and had allegedly threatened certain witnesses of the state. Parker claims the use of the screen prejudiced him by its clear expression that he was dangerous.

■■■ A trial court's decision concerning courtroom security is accorded broad discretion and will not be reversed absent a showing of abuse. *Gilmore*, 861 F.2d at 1071 (citations omitted). *See also United States v. Lee*, 886 F.2d 998, 1001 (8th Cir.1989) (noting that the need for and extent of security measures during trial are within the discretion of the trial court). Furthermore, the burden of affirmatively demonstrating prejudice from security measures is on the defen-

dant. *United States v. Williams*, 897 F.2d 1430, 1434 (8th Cir.1990).

The Court finds no abuse of discretion in the trial court's use of the screen. Although a deputy sheriff was sitting immediately behind Parker at the counsel table, Parker was free to walk around during the course of the trial without any handcuffs or other forms of restraint. D.Ct.Tr. at 10. The trial court's concern for the safety of witnesses was clearly justified as three of the prosecution's witnesses, Pam Warren, her sister, Cindy, and Officer Ray Feyan, were objects of Parker's assault on the day in which the murders took place. Considering the circumstances of this case, the trial court's use of the screen appears to be a reasonable balance between insuring Parker's right of self-representation free from the possible prejudice that might result from physical restraint or other restrictive measures and, at the same time, protecting those witnesses who had been the objects of his assault. *See Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976) ("Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience"); *Holbrook v. Flynn*, 475 U.S. 560, 571–72, 106 S.Ct. 1340, 1347–48, 89 L.Ed.2d 525 (1986) (courts must balance the possibility of prejudice against the need to maintain order in the courtroom and custody over incarcerated persons).

■■■ The Court likewise rejects Parker's claim of prejudice. The prospective jurors stated during *voir dire* that the screen would have no effect on their deliberations and would not cause them to assume Parker was guilty. Tr. at 658–59, 694–95, 721, 802, 831, 870, 969, 1021, 1055, 1148–49. Parker has made no showing of prejudice from the use of the screen and this Court cannot presume it. *United States v. Robinson*, 645 F.2d 616, 618 (8th Cir.), *cert. denied*, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). *Cf.*

---

22. Parker requested from the trial court "law books ... legal papers and transcripts ... and a little extra telephone use and maybe a few witnesses I can interview in the attorney's room and maybe the use of an ink pen or a typewriter." Tr. at 1–2 (Vol. 10).

23. As described at the evidentiary hearing, the plexiglass screen was attached to the witness box around all three sides and extended above the head of a person sitting in the witness chair. D.Ct.Tr. at 7. The screen was mounted throughout the entire trial and did not affect the visibility of any witness. D.Ct.Tr. at 7–8.

*Williams,* 897 F.2d at 1434 (no prejudice where uniformed U.S. Marshal stood next to defendant during his testimony).

### VII.

■ Parker next contends the introduction of evidence regarding his subsequent conduct deprived him of his right to a fair trial. Immediately after killing the Warrens, Parker kidnapped Pam Warren from her apartment and later shot her and a policeman during a hostage situation at the Rogers police station. The trial court admitted this evidence but admonished the jury that it could only consider the evidence in determining whether Parker had a state of mind sufficient to constitute the crime of capital murder. Tr. at 1293. Parker claims this evidence was prejudicial and irrelevant to the charge for which he was being tried.

■ Parker is not entitled to relief on this issue since questions relating to the admissibility of evidence are matters of state law and generally are not cognizable in an action for habeas corpus. *Wood v. Lockhart,* 809 F.2d 457, 459–60 (8th Cir.1987). In order for an evidentiary error to give rise to habeas relief, the error complained of must be such that it "fatally infected the trial and failed to afford petitioner the fundamental fairness which is the essence of due process." *Id.* See also *McCafferty v. Leapley,* 944 F.2d 445, 453 (8th Cir.1991) ("[a]n evidentiary error violates a defendant's due process rights only when the error complained of is so gross, conspicuously prejudicial, or otherwise of such magnitude that it fatally infects the trial"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992).

The Arkansas Supreme Court reasoned as follows in concluding that evidence of Parker's subsequent conduct was admissible:

> Rule 404(b) [of the Arkansas Rules of Evidence] provides that evidence of other crimes, wrongs, or acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In the present case, the theory of the state's case was that [Parker] planned to kill the entire Warren family. The state developed its case to show [Parker's] intent to kill Mr. and Mrs. Warren was precipitated because of his domestic troubles with the Warren's daughter, Pam. The record reveals [Parker] had married Pam and the relationship was beset with troubles related to his involvement in drugs. The state showed that Pam had divorced [Parker], and as a consequence, [Parker] ended up terrorizing not only Pam but her sister, Cindy, and her parents, who had favored Pam's separation from [Parker]. The state's evidence painted a picture of a series of terroristic acts and threats towards each member of the Warren family. Immediately after [Parker] killed Mr. and Mrs. Warren and his attempt to do the same to Cindy, [Parker] went to where Pam lived and forced her to go with him to the police station, where he shot a police officer. The testimony reveals he held Pam as a hostage and requested that Cindy Warren be brought to him. During this time, he had also shot Pam in the abdomen and told her that he had killed her parents. When he was arrested, [Parker] possessed the same automatic gun used in his shooting of the Warrens and he wore the same army camouflage or combat clothing he had changed into before going to the Warrens to kill them.
>
> These events following the killing of the Warrens were extremely probative in that they revealed not only that [Parker] killed the Warrens but also that he had planned to kill the entire Warren family and that he induced the hostage situation in an effort to get both Pam and Cindy at the police station so he could consummate his plan. We also believe the events following the Warrens' killings were admissible because the entire sequence of events was such an inseparable whole that the state was entitled to prove the entire criminal episode. *See Thomas v. State,* 273 Ark. 50, 615 S.W.2d 361 (1981); *Russell v. State,* 262 Ark. 447, 559 S.W.2d 7 (1977); *Harris v. State,* 239 Ark. 771, 394 S.W.2d 135 (1965).

*Parker II,* 779 S.W.2d at 158.

The interpretation of state law is a matter for the state courts, *see Hill,* 927 F.2d at 343, and there is nothing in the ruling of either

the trial court or the Arkansas Supreme Court that could be considered a due process violation on this issue. The trial court's instruction to the jury that it could only consider the evidence in determining whether Parker had a state of mind sufficient to constitute the crime of capital murder limited any prejudicial effect this evidence may otherwise have had.

### VIII.

■ Parker next claims he was prejudiced by the prosecutor's opening statement to the jury in the guilt phase of the trial. Citing *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), Parker argues that the prosecutor made improper biographical sketches of James and Sandra Warren in his summation of their lives up to the point of their murder. Tr. 1191–92.

■ In a habeas proceeding, the appropriate standard of review for allegedly improper statements by the prosecutor is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). It is not enough that the remarks were undesirable or even universally condemned. *Id.* Rather, the relevant question is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id. See also Pollard v. Delo*, 28 F.3d 887, 889 (8th Cir. 1994); *Jones v. Jones*, 938 F.2d 838, 844–45 (8th Cir.1991).

The Court has carefully considered the record on this issue and finds no merit in Parker's claim. The evidence of Parker's guilt was both overwhelming and uncontroverted, and the Court cannot discern any prejudicial effect from the limited statements of the prosecutor. It simply cannot be said that the prosecutor's statements so infected the trial with unfairness as to make Parker's resulting conviction a denial of due process. *Cf. Pollard*, 28 F.3d at 889.

Although Parker cites *Booth* and *Gathers* in support of his claim, the Supreme Court recently held in *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on the subject, the Eighth Amendment erects no *per se* bar." In so holding, the Supreme Court overruled its decisions in *Booth* and *Gathers* that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial. *Id.*, 501 U.S. at 830, 111 S.Ct. at 2611.

Parker acknowledges that *Payne* overruled *Booth* and *Gathers*, but argues that because Arkansas had no procedure for the admission of victim impact evidence, the admission of such evidence in his trial violated his due process rights as set forth in *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). The Court disagrees. *Hicks* stands for the proposition that a state's failure to comply with its own procedural rules may give rise to a due process violation. 447 U.S. at 346, 100 S.Ct. at 2229. The State of Arkansas, however, had no specific procedure governing the admission of victim impact evidence, a fact that Parker himself acknowledges. Thus, even assuming the prosecutor's statements constituted victim impact evidence, and assuming that *Booth* and *Gathers* apply to the guilt phase of a capital murder trial, the admission of such evidence violated no set procedure that would give rise to a due process claim. *Hicks* affords Parker no relief.

### IX.

Finally, Parker claims that in the event any of the aforementioned issues is deemed to have been procedurally defaulted, then such default was a result of ineffective assistance of counsel. However, the respondent does not contend that any of the issues in Parker's petition are procedurally defaulted, and the Court has addressed each issue on its merits. Accordingly, this issue is moot.

■ The Court would note in any event that Parker's *pro se* status precludes a claim of ineffective assistance of counsel. *See Farreta*, 422 U.S. at 834, 95 S.Ct. at 2540.

While it is true that Parker at times deferred to standby counsel, Parker clearly was in charge of his defense and, thus, is responsible for any actions which may otherwise have given rise to a claim of ineffective assistance. This is so regardless of whether these actions were committed by standby counsel. Any confusion in the record regarding the presentation of Parker's defense is attributable to Parker and does not relieve him of the consequences of his choice to represent himself.

### X.

In sum, the Court grants Parker's petition for writ of habeas corpus on the ground that his due process rights were violated in the denial of a psychiatrist to assist him in evaluating, preparing, and presenting his mental condition as a mitigating circumstance during the penalty phase of his trial. All other issues are without merit. The state is ordered to resentence Parker within 120 days or reduce his sentence to life without parole.

IT IS SO ORDERED.