64 F.3d 1178
 William Frank PARKER, Plaintiff-Appellant/Cross-Appellee,
v.
Larry NORRIS, Director, Arkansas Department of Correction,
Defendant-Appellee/Cross-Appellant.
 Nos. 94-3022, 94-3104.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 10, 1995.
Decided Aug. 31, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Oct.
11, 1995.*
 
 Jeffrey M. Rosenzweig, Little Rock, AR, argued, for appellant.
 Olan W. Reeves, Little Rock, AR, argued (Kelly K. Hill, on the brief), for appellee.
 Before WOLLMAN, Circuit Judge, FRIEDMAN,** Senior Circuit Judge, and LOKEN, Circuit Judge.
 LOKEN, Circuit Judge.
 
 
 1
 William Frank Parker, an Arkansas inmate under sentence of death, appeals the district court's denial of various claims raised in his petition for a writ of habeas corpus. The State cross-appeals the district court's decision that Parker was denied adequate psychiatric assistance at the penalty phase of his trial. We conclude that Parker was afforded constitutionally-mandated psychiatric assistance throughout his trial, and that the district court properly rejected his other claims. Accordingly, we remand with directions to deny his petition for a writ of habeas corpus.
 
 
 2
 I. Factual and Procedural Background.
 
 
 3
 Soon after Parker and Pam Warren divorced, Parker approached the home of Pam Warren's parents, James and Sandra Warren, dressed in combat fatigues and carrying a 9mm pistol. When James Warren and daughter Cindy Warren left the house, Parker attacked. Cindy sprayed mace at Parker, ran towards a neighbor's house, and escaped. Parker followed James into the house, where he shot and killed James and Sandra Warren. Parker then abducted Pam Warren from her apartment and took her to a police station, where he shot and seriously wounded Pam and a police officer before surrendering several hours later.
 
 
 4
 Parker was convicted of capital felony murder and sentenced to death for killing James and Sandra Warren. The Arkansas Supreme Court reversed because the killings were not committed during the course of an independent felony. Parker v. State, 292 Ark. 421, 731 S.W.2d 756, 758-59 (1987) (Parker I ). The State then retried Parker for the Warren homicides, this time charging him with premeditated capital murder. He was again convicted and sentenced to death. The Arkansas Supreme Court affirmed on direct appeal, Parker v. State, 300 Ark. 360, 779 S.W.2d 156 (1989) (Parker II ), cert. denied, 498 U.S. 883, 111 S.Ct. 218, 112 L.Ed.2d 186 (1990), and denied postconviction relief. See Rosenzweig v. State, 301 Ark. 475, 784 S.W.2d 776 (1990); Parker v. State, No. Cr. 88-95, 1991 WL 19889 (Ark.), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991).
 
 
 5
 Parker then commenced this federal habeas proceeding, raising nine claims. The district court first denied the claim that his retrial violated the Double Jeopardy Clause. Parker v. Lockhart, 797 F.Supp. 718 (E.D.Ark.1992). After a hearing, the court then granted habeas relief on Parker's penalty-phase psychiatric assistance claim and denied his remaining claims. Parker v. Norris, 859 F.Supp. 1203 (E.D.Ark.1994). Parker appeals the denial of his Double Jeopardy Clause claim, his guilt-phase psychiatric assistance claim, and three claims regarding the jury's finding of an aggravating circumstance. The State cross-appeals the grant of death penalty relief.
 
 
 6
 II. The Double Jeopardy Clause Issue.
 
 
 7
 In the first trial, Parker was convicted of capital felony murder for killing James and Sandra Warren "in the course of and in furtherance of" a burglary. Ark.Code Ann. Sec. 5-10-101(a)(1) (Michie 1987). The Arkansas Supreme Court reversed, concluding that Parker's burglary of the Warren home did not support a felony murder conviction. "[T]he burglary must have an independent objective which the murder facilitates. In this instance, the burglary and murder have the same objective." Parker I, 731 S.W.2d at 759. On remand, the State convicted Parker of capital murder under a different subsection of the statute--killing "[w]ith the premeditated and deliberated purpose of causing [the Warrens'] death." Ark.Code Ann. Sec. 5-10-101(a)(3) (Michie 1987). Parker contends that his retrial violated the Double Jeopardy Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment.
 
 
 8
 The Double Jeopardy Clause "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." Lockhart v. Nelson, 488 U.S. 33, 38, 109 S.Ct. 285, 289-90, 102 L.Ed.2d 265 (1988). There is an important exception to this rule. Retrial is barred if a conviction is reversed because the evidence was legally insufficient; reversal on that ground is equivalent, for double jeopardy purposes, to a verdict of acquittal. See Burks v. United States, 437 U.S. 1, 16-18, 98 S.Ct. 2141, 2149-2151, 57 L.Ed.2d 1 (1978). Relying primarily on Burks, Parker argues that the Double Jeopardy Clause bars his retrial because the State presented legally insufficient evidence at his first trial to convict him of capital felony murder.
 
 
 9
 There is considerable logic in Parker's contention that his first conviction was reversed because of a failure of proof. But the Supreme Court has repeatedly refused to extend Burks as far as logic might permit. On the day Burks was decided, the Court explained that its sweep is limited to reversals "that necessarily establish the criminal defendant's lack of criminal culpability." United States v. Scott, 437 U.S. 82, 98, 98 S.Ct. 2187, 2197-98, 57 L.Ed.2d 65 (1978) (citation omitted). In Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982), the Court held that reversal of a conviction because it is against the weight of the evidence does not bar retrial because "reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict." In Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 306-07, 104 S.Ct. 1805, 1812-13, 80 L.Ed.2d 311 (1984), the Court held that Burks does not bar a state court procedure in which a defendant convicted after a bench trial has a right to a jury trial de novo. And in reversing this court in Lockhart v. Nelson, the Court held that Burks does not bar retrial of a defendant whose conviction was reversed for the improper admission of evidence, even if the remaining evidence was insufficient to convict. 488 U.S. at 40, 109 S.Ct. at 290-91. These decisions make it clear that Burks is indeed an exception to the general rule that the State may retry a defendant whose conviction is reversed for "trial error."
 
 
 10
 That brings us to Montana v. Hall, 481 U.S. 400, 107 S.Ct. 1825, 95 L.Ed.2d 354 (1987), a case the district court found dispositive. The Montana Supreme Court had reversed defendant's conviction of incest, and barred his retrial on double jeopardy grounds, because the incest statute did not apply to sexual assaults against stepchildren. The Supreme Court reversed, concluding that the Double Jeopardy Clause did not bar retrial on the different charge of sexual assault because the state court's reversal was "on grounds unrelated to guilt or innocence." "[T]he State simply relied on the wrong statute.... It is clear that the Constitution permits retrial after a conviction is reversed because of a defect in the charging instrument." 481 U.S. at 403-04, 107 S.Ct. at 1827.
 
 
 11
 Parker argues that Hall can be disregarded as "a weird fact-based variance from double jeopardy jurisprudence." We disagree. Almost a century ago, the Supreme Court held that the Double Jeopardy Clause does not bar retrial of a defendant whose first conviction was reversed because of a legally defective indictment. United States v. Ball, 163 U.S. 662, 671-72, 16 S.Ct. 1192, 1195-96, 41 L.Ed. 300 (1896). In Burks itself, the Supreme Court commented, "We have no doubt that Ball was correct in allowing a new trial to rectify trial error." 437 U.S. at 14, 98 S.Ct. at 2149 (emphasis in original). Thus, the district court correctly proceeded to determine whether Parker's first conviction was reversed because of a "defect in the charging instrument," as in Hall, or because of an evidentiary insufficiency equivalent to a verdict of acquittal, as in Burks. See United States v. Todd, 964 F.2d 925, 929 (9th Cir.1992); United States v. Davis, 873 F.2d 900, 903-06 (6th Cir.), cert. denied, 493 U.S. 923, 110 S.Ct. 292, 107 L.Ed.2d 271 (1989).
 
 
 12
 In making that determination, the district court looked carefully at the two decisions of the Arkansas Supreme Court:
 
 
 13
 The issue before the Arkansas Supreme Court in Parker I was one of statutory construction, not sufficiency of the evidence. That is, the court considered whether the capital felony murder statute under which Parker was charged was applicable to his conduct as a matter of law, not whether the prosecution had failed to prove Parker's guilt beyond a reasonable doubt.
 
 
 14
 * * * * * *
 
 
 15
 Any ambiguity in Parker I was resolved by the Arkansas Supreme Court in Parker II. In that case, the court clearly disavowed any notion that its earlier opinion was based upon the failure of the state to prove its case. The conviction was overturned due to trial error "in charging and trying Parker under the wrong capital murder provision." Parker II, 779 S.W.2d at 157.
 
 
 16
 Parker v. Lockhart, 797 F.Supp. at 721, 722. We agree with this analysis. "In determining whether a reversal was based on evidentiary sufficiency [for double jeopardy purposes], we must rely on the reasons of the reversing court, whether state or federal." DuBois v. Lockhart, 859 F.2d 1314, 1318 (8th Cir.1988). Giving deference to the reversing court's characterization of its decision obeys the Supreme Court's guiding principle in deciding this kind of Double Jeopardy Clause issue:
 
 
 17
 From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.
 
 
 18
 United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964), quoted in Hall, 481 U.S. at 403, 107 S.Ct. at 1826-27. Thus, the district court properly denied Parker's Double Jeopardy Clause claim.
 
 
 19
 III. Psychiatric Assistance Issues.
 
 
 20
 Parker asserts that the State violated Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), by denying Parker, an indigent criminal defendant, the assistance of a state-funded psychiatrist during both the guilt and penalty phases of his second trial. The district court denied the guilt-phase claim but granted habeas relief on the penalty-phase claim. Both sides appeal. Discussion of these issues requires additional background facts.
 
 
 21
 At Parker's first trial, he unsuccessfully urged an insanity defense. Before trial, he was examined at the Arkansas State Hospital. At trial, the forensic psychologist who performed that examination testified for the State, and a clinical psychologist testified for the defense. See Parker I, 731 S.W.2d at 760-62. These psychologists agreed that Parker was competent to stand trial and not insane at the time of the homicides.
 
 
 22
 Before the start of the second trial, Parker moved to represent himself, asserting that he was "not suffering from a mental disease or defect which would render him unable to understand the proceedings against him." Appointed defense counsel then moved for the appointment of a psychiatrist to assist the defense, contradicting their client by stating that Parker "may be incapable of assisting in his own defense," and complaining that Parker had only been examined by psychologists before the first trial. The State opposed counsel's motion, arguing that, given the two psychological evaluations done in connection with the first trial, "the sanity of [Parker] at the time of the alleged crime is not likely to be a significant factor at trial."The trial court held a hearing on these conflicting motions. After questioning Parker at length, the court granted his motion to represent himself but directed appointed counsel to remain as standby counsel should Parker need their assistance. The court asked Parker if he supported counsel's motion for psychiatric assistance. Parker responded equivocally and noted that, as a death row inmate, he was being treated by Dr. Walter Oglesby, an Arkansas State Hospital staff psychiatrist. The court then ruled:
 
 
 23
 Now, as far as the additional psychiatric assistance, at this time I don't see that it's necessary because of the fact that Mr. Parker asserts no defense of insanity and unless and until I'm convinced that it's necessary I'm not going to order it but if sufficient information comes to me from either Mr. Parker or from standby counsel or from any other source to indicate that [additional psychiatric assistance is] necessary then I'll order it.
 
 
 24
 The second trial began one month later with Parker incarcerated at a nearby jail. On the second day of voir dire, standby counsel orally renewed their motion for appointment of a defense psychiatrist, advising the court that Parker had changed his mind and now wanted such assistance. The court denied the motion, commenting, "I do not see that there is an issue concerning mental disease."[1] However, two days later, during a break in the lengthy voir dire, when Parker complained to the court that the Sheriff would not allow Parker to phone Dr. Oglesby from the jail, the court summoned the Sheriff and stated:
 
 
 25
 [It appears that] instructions which I issued yesterday afternoon were deliberately ignored by one of your staff and I'm especially upset about it. The order was that Mr. Parker be permitted to call a psychiatrist in Little Rock which he had requested and in view of the circumstances I feel that this was the best way for him to make contact with the witness. He attempted to do so and was told ... that he couldn't do it. I want to know why?
 
 
 26
 After hearing the Sheriff's explanation, the court ruled, "I do expect that he will be permitted to talk to Doctor Oglesby and to his attorneys."
 
 
 27
 The next day, Parker complained that jail staff had cut short a late-night telephone conversation with Dr. Oglesby. The court responded, "I'll take care of it." The following trial day, after the prosecutor's opening statement, Parker moved for a continuance on the ground that jail staff had denied him court-approved assistance, including adequate contact with Dr. Oglesby. The court immediately held a hearing on this motion. With regard to Dr. Oglesby, Parker testified on direct examination:
 
 
 28
 Q. ... Dr. Oglesby is a psychiatrist, is he not?
 
 
 29
 A. Yes, sir.
 
 
 30
 Q. And do you consider the testimony that he may or may not have to be essential to your defense in this case?
 
 
 31
 A. Definitely, yeah.
 
 And on cross examination:
 
 32
 Q. Do you intend to call [Dr. Oglesby] as a witness in this case?
 
 
 33
 A. Definitely.
 
 
 34
 Q. And on what issue?
 
 
 35
 A. Mitigation.
 
 And in argument to the court:
 
 36
 MR. PARKER: I think that if granted a continuance I could call Doctor Oglesby, stop him from coming up here [tonight] so we can communicate a little bit better instead of him coming here in the middle of the trial trying to talk.
 
 
 37
 The court granted Parker a four-day continuance and ordered the Sheriff to provide Parker access to Dr. Oglesby. The guilt phase of the trial then proceeded to conclusion with no further mention of Dr. Oglesby or the motion to appoint a psychiatrist. Parker did not assert the defense of insanity,[2] and neither side offered testimony by a psychologist or psychiatrist as to Parker's mental condition when the Warrens were killed.
 
 
 38
 At the penalty phase, the State offered no evidence of Parker's mental condition in its initial case. Dr. Oglesby testified at length as a witness for the defense. Based upon his review of Parker's medical history from Arkansas State Hospital files, and his lengthy treatment of Parker as an inmate, Dr. Oglesby opined that at the time of the killings Parker suffered from a major depressive disorder, an explosive or rage disorder, a mixed personality disorder, and drug and alcohol abuse. As a result, "he was suffering from a mental disease that was an extreme emotional distress at the time," and "because of his severe depression at the time he had impairment of his judgment." If believed by the jury, this testimony would have established two statutory mitigating circumstances for penalty purposes. See Ark.Code Ann. Secs. 5-4-605(1), (3) (Michie 1987).
 
 
 39
 Dr. David Pritchard, the psychologist who testified for the State at the first trial, then testified for the prosecution in rebuttal. He again testified that Parker was competent to stand trial and not insane at the time of the killings. He also opined that the homicides were too well-planned and methodically carried out to be the product of either major depression or a rage disorder. On cross examination, Dr. Pritchard agreed with Dr. Oglesby that at the time of the offense Parker "was suffering under an emotional disorder," but would not agree it was an "extreme emotional disturbance." He admitted that he had never performed certain additional psychological testing that was an issue at the first trial. See Parker I, 731 S.W.2d at 759-61.
 
 
 40
 Dr. Oglesby testified for the defense on surrebuttal, again opining that at the time of the offense Parker suffered from "clinically significant depression" that "was a factor in his behavior, in his ability to control his behavior." On cross examination, when asked whether he had completed the additional testing that Dr. Pritchard had not done, Dr. Oglesby stated that he had evaluated Parker for treatment purposes, not to prepare to testify at trial.
 
 
 41
 The jury verdict form included a section on mitigating circumstances. One or more but less than all jurors found that Parker committed capital murder "acting under unusual pressures or influences." Though this finding was somewhat favorable to Parker, the jury unanimously found no extreme mental or emotional disturbance and no impairment from mental defect or drug abuse, the statutory mitigating circumstances. Thus, to the extent Parker's mental condition was relevant at the penalty phase, the prosecution won this battle of the experts. Parker asserts, and the district court concluded, that this victory was tainted by an Ake violation.
 
 
 42
 In Ake v. Oklahoma, the Supreme Court held: "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial [or at a capital sentencing proceeding], the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096. We applied Ake in Starr v. Lockhart, 23 F.3d 1280 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). In Starr, an Arkansas death penalty case involving a mildly retarded defendant, we held that a competency evaluation at the Arkansas State Hospital plus the ability to subpoena the professionals who performed that evaluation to testify at trial do not satisfy Ake:
 
 
 43
 We find that Starr's exam [at the Arkansas State Hospital] was inappropriate because it did not delve into the mitigating questions essential to Starr. As the Arkansas Supreme Court has recognized, the issue of mitigation, or diminished capacity, is different from that of guilt....
 
 
 44
 * * * * * *While due process admittedly does not give defendants the right to assistance from their experts of choice, it does give appropriate defendants the right to experts who will "assist in evaluation, preparation, and presentation of the defense."
 
 
 45
 23 F.3d at 1289-90 (citations omitted).
 
 
 46
 From the standpoint of Ake compliance, this case is factually distinguishable in critical respects. As in Starr, the trial court denied the initial motion by Parker's counsel for appointment of a psychiatrist. But relevant similarities between the two cases stop at that point. Here, the trial court ruled, after a hearing, that there was no showing of need for psychiatric assistance but said it would revisit the issue if presented with evidence of need. Given Parker's decision to represent himself, his failure to support counsel's motion, and his refusal to assert an insanity or diminished capacity defense, this initial ruling did not violate Ake. See Branscomb v. Norris, 47 F.3d 258, 262 (8th Cir.) (right to appointed psychiatrist requires preliminary showing that "the accused's mental condition is crucial to his defense"), cert. denied, --- U.S. ----, 115 S.Ct. 2260, 132 L.Ed.2d 266 (1995); Guinan v. Armontrout, 909 F.2d 1224, 1227-28 (8th Cir.1990) ("counsel's belief that Guinan suffered from a mental disease.... not supported by example or more detailed explanation, cannot be said to have demonstrated to the judge that Guinan's mental state was to be an issue at trial"), cert. denied, 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991).
 
 
 47
 Later in the jury selection process, Parker made it clear to the court that he wanted to present psychiatric testimony for mitigation purposes. Parker asked for access to Dr. Oglesby, who had been treating Parker in prison for clinical depression. The trial court twice ordered the Sheriff to allow Parker access to Dr. Oglesby and then ordered a four-day trial continuance primarily because Parker argued that he needed a better opportunity to meet with Dr. Oglesby. So far as we can discern from the record, the Ake issue never arose again throughout the trial, nor did Parker again complain of inadequate access to Dr. Oglesby's assistance. During the guilt phase, neither side presented expert testimony relating to Parker's mental condition. During the penalty phase, Dr. Oglesby testified for over one hundred transcript pages in support of Parker's claim of statutory mitigating circumstances.
 
 
 48
 On this record, there was simply no Ake violation. Parker had the state-funded assistance of Dr. Oglesby, and not simply by trial subpoena as in Starr. As we said in Starr, Parker had no right to his "experts of choice," but here Parker repeatedly stated or implied that Dr. Oglesby was in fact Parker's expert of choice. The trial court ordered that Parker be allowed to consult with Dr. Oglesby when the issue first arose, before testimony began in the guilt phase, and the court placed no limit on those consultations. After the court granted Parker access to Dr. Oglesby and a four day continuance, it heard no further complaints on this issue. Parker never told the court he needed more psychiatric evaluation or assistance. Dr. Oglesby never requested more access to Parker or time to perform more testing. True, Dr. Oglesby was ultimately cross-examined about tests he did not perform, but he did not retreat from his opinions. Indeed, he testified at the district court hearing that his evaluation had been adequate to support the opinions he expressed at trial on mitigation issues.
 
 
 49
 Parker argues that the State violated Ake because Dr. Oglesby did not give enough assistance in the evaluation and preparation stages of the defense. In evaluating this claim, we examine the information before the trial court at the time of the alleged violation. See Clisby v. Jones, 960 F.2d 925, 930 (11th Cir.1992) (en banc). Therefore, even if the prosecutor ultimately cross examined Dr. Oglesby more effectively than standby counsel cross examined Dr. Pritchard, that does not establish that the trial court previously deprived Parker of constitutionally-mandated psychiatric assistance. Unlike the situation in Starr, the trial court here afforded Parker unlimited access to Dr. Oglesby before testimony began and throughout the trial.
 
 
 50
 IV. Aggravating Circumstance Issues.
 
 
 51
 At the time of Parker's conviction, Arkansas law provided that the jury "shall impose a sentence of death" if it unanimously finds beyond a reasonable doubt that one or more statutory aggravating circumstances justify a sentence of death and outweigh beyond a reasonable doubt all mitigating circumstances found to exist. Ark.Code Ann. Secs. 5-4-602(3), -603(a) (Michie 1987). One statutory aggravating circumstance was that the defendant previously committed another violent felony. Id. at Sec. 5-4-604(3).
 
 
 52
 During the penalty phase, the State presented evidence that, six months before the killings, Parker threw a knife at Pam Warren, missing her head by about six inches, and later pointed a shotgun at her for five minutes. Though no criminal charges were brought for this conduct, the State argued that it constituted the felonies of aggravated assault and terroristic threatening. Under Arkansas law, the prosecution may prove previously uncharged prior felonies to establish this aggravating circumstance. Miller v. State, 280 Ark. 551, 660 S.W.2d 163, 165 (1983). Therefore, the trial court submitted and the jury unanimously found this aggravating circumstance, and the Arkansas Supreme Court held that the evidence was sufficient to uphold this finding.
 
 
 53
 We have held the prior felony aggravating circumstance constitutional, and Parker does not revisit that question. See Whitmore v. Lockhart, 8 F.3d 614, 624-25 (8th Cir.1993). Rather, he raises three issues regarding its application in his case--that the trial court erred in failing to instruct the jury on lesser included offenses of the alleged prior felonies; that the jury's finding of a prior violent felony was inconsistent with its finding of "no significant history of prior criminal activity"; and that the Arkansas Supreme Court unconstitutionally applied a lower standard of appellate review.
 
 
 54
 A. The Aggravating Circumstance Instruction.
 
 
 55
 Parker argues that, had the trial court instructed the jury on lesser-included offenses to terroristic threatening and aggravated assault, the jury might have found that he committed one or more misdemeanors, which would not have triggered the prior felony aggravating circumstance. Parker relies upon Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in which the Supreme Court held that, in the guilt phase of a capital case, the jury must be instructed on lesser included offenses that the evidence would support. Parker argues that Beck should apply equally to the penalty phase of his capital murder case. We disagree.
 
 
 56
 In Beck, an Alabama statute prohibited lesser-included offense instructions in capital cases, a practice contrary to common law, to Alabama law in non-capital cases, and "unique in American criminal law." 447 U.S. at 635, 100 S.Ct. at 2388. By this practice, "the jury is given the choice of either convicting the defendant of the capital crime, in which case it is required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties." 447 U.S. at 628-29, 100 S.Ct. at 2385. The Court concluded that this practice "introduce[s] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case":
 
 
 57
 [O]n the one hand, the unavailability of the third option of convicting on a lesser-included offense may encourage the jury to convict for an impermissible reason--its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason--that, whatever his crime, the defendant does not deserve death.
 
 
 58
 447 U.S. at 642-43, 100 S.Ct. at 2392.
 
 
 59
 At the penalty phase, Parker's jury was properly instructed that it might find that he committed one or more prior violent felonies, a statutory aggravating circumstance. But that was not an "all or nothing" issue, as in Beck. Here, the jury had already convicted Parker of capital murder. Moreover, even if it found the prior felony aggravating circumstance, it could only impose a sentence of death after considering (i) whether this aggravating circumstance justified a sentence of death, and (ii) whether this aggravating circumstance outweighed any mitigating circumstances found to exist. Thus, like the district court, we conclude that this aspect of Arkansas law did not contain the defect that was essential to the Supreme Court's decision in Beck. See Spaziano v. Florida, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159-60, 82 L.Ed.2d 340 (1984) ("the goal of the Beck rule ... is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence"), quoted in Schad v. Arizona, 501 U.S. 624, 646-48, 111 S.Ct. 2491, 2505, 115 L.Ed.2d 555 (1991).
 
 
 60
 B. Inconsistent Jury Findings.
 
 
 61
 Parker argues that the jury's findings at the penalty phase were inconsistent because the jury unanimously found the prior violent felony aggravating circumstance, yet some jurors found, as a mitigating circumstance, that "Parker has no significant history of prior criminal activity." The Arkansas Supreme Court ruled that these findings were not inconsistent:
 
 
 62
 [W]e believe the jury could have unanimously found appellant committed prior violent felonies used by the state in showing an aggravating circumstance, but at the same time, some jurors may not have considered these prior felonies a significant history of prior criminal activity.
 
 
 63
 Parker II, 779 S.W.2d at 160. Parker responds that jurors who found his prior criminal history insignificant could not rationally conclude that the prior violent felony aggravating circumstance outweighed this mitigating circumstance. However, we agree with the district court that the Arkansas Supreme Court reasonably interpreted the jury's findings. Parker's argument is essentially semantic and must be rejected. See Simmons v. Lockhart, 814 F.2d 504, 513-14 (8th Cir.1987), cert. denied, 485 U.S. 1015, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988).
 
 
 64
 Parker further suggests that the verdict form failed to inform jurors that they could consider non-unanimous mitigating circumstances, thereby violating the Supreme Court's decisions in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). We rejected the same contention in Pickens v. Lockhart, 4 F.3d 1446, 1452-53 (8th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1206, 127 L.Ed.2d 553 (1994).
 
 
 65
 C. The Standard of Appellate Review.
 
 
 66
 Parker argues that the Arkansas Supreme Court violated his due process rights when it held that "the same degree of proof is not required to sustain a jury finding that an aggravating circumstance exists, as would be required to sustain a conviction." Parker II, 779 S.W.2d at 160. The jury found beyond a reasonable doubt that the prior felony aggravating circumstance existed, as Arkansas law required. See Ark.Code Ann. Sec. 5-4-603 (Michie 1987). Thus, in this case, unlike Rust v. Hopkins, 984 F.2d 1486, 1493 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), on which Parker relies, the trial court factfinder applied the proper standard, and the appellate court did not subvert the statutory process. Instead, the Arkansas Supreme Court reviewed the evidence and found it sufficient to uphold the jury's finding on appeal.[3]
 
 
 67
 Parker's contention ignores the applicable federal standard of review: "[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation ... the ... appropriate standard of review is the 'rational factfinder' standard established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)." Lewis v. Jeffers, 497 U.S. 764, 781, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); see Grubbs v. Delo, 948 F.2d 1459, 1469 (8th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 109, 121 L.Ed.2d 67 (1992). The district court reviewed the evidence under that standard and concluded "a rational trier of fact could have found beyond a reasonable doubt the existence of the 'prior violent felony' aggravating circumstance." Parker v. Norris, 859 F.Supp. at 1218. We agree.
 
 
 68
 The judgment of the district court is reversed and the case is remanded with instructions to deny the petition for a writ of habeas corpus.
 
 
 
 *
 Arnold, Chief Judge and McMillian, Circuit Judge, would grant the suggestion for rehearing en banc
 
 
 **
 The HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The next day, Parker filed a hand-written motion for psychiatric assistance, confirming counsel's representation to the court that Parker had changed his mind on this issue. The trial record contains no ruling on this motion. Both the Arkansas Supreme Court and the district court assumed that it was denied. However, given the trial court's actions beginning the very next day to ensure Parker effective access to Dr. Oglesby, we think it more realistic to conclude that, consistent with Ake, the trial court granted this motion by affording Parker the assistance from Dr. Oglesby that he appeared to need for mitigation issues
 
 
 [2]
 Standby counsel testified at the evidentiary hearing in the district court that Parker personally directed the defense and would not permit counsel to interpose an insanity defense
 
 
 [3]
 It is clear that Court provides a "meaningful appellate review ... of the appropriateness of the death penalty [in a particular case]." Collins v. State, 261 Ark. 195, 548 S.W.2d 106, 120, cert. denied, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977). For example, it reduced a death sentence to life without parole or ordered a new trial when it found insufficient evidence to support a prior violent felony aggravating circumstance in Miller, 660 S.W.2d at 165-66